The next case is 411-0398 Morr-Fitz v. Quinn et al. With the appellant is Carl J. Ehlitz. Is that pronounced correctly? And for the appellate is Mark Rienzi. Rienzi, okay. Mr. Ehlitz, you may proceed, sir. Yes, Your Honor, and please the court. Good morning, Your Honors. Illinois Assistant Attorney General Carl Ehlitz for the Illinois Department of Financial and Professional Regulation, the Division of Professional Regulation. Your Honors, it's important before we launch off on what the legal analysis for this appeal should be to first understand specifically what it is the rule requires that's before you. We've had a bunch of different rules that the department... You have to speak up a little bit. The department has promulgated several different rules over the years that don't apply to this case. And I want to make it very clear before we begin as to what the rule requires of this particular plaintiff so that there's no misunderstanding. Prior versions of the rule required the plaintiffs to stock Plan B and other drugs that they found religiously objectionable or dispense the drug or both. But the current version of the rule does none of those things. What it requires is for the pharmacies to meet a duty to deliver these drugs, or if they don't have them in stock and they never will have them in stock because it violates their beliefs to carry them, to provide a customer with a timely alternative for appropriate therapy. And that's a critically important part of my argument. My argument is that as far as the state could possibly go with regard to licensing pharmacies without violating the obligation of protecting public health. So I'll come back to that as I move through it. The second point I wanted to bring up before launching into the legal analysis is the point that neither of the two statutory provisions that are at issue, the Conscience Act or the Illinois Religious Freedom Restoration Act, have any provisions for entering the type of broad injunction that the trial court entered in this case. Without that statutory authority for entering the type of injunction the court entered, the court needed necessarily to find a First Amendment violation. And so for that reason I've moved the First Amendment analysis up to the front of my brief instead of where it normally would go in the back because the court's going to have to reach the First Amendment questions anyway. The court wants me to talk about the Conscience Act or the Religious Freedom Restoration Act first. I'm happy to do that. But I'd like to start with the First Amendment. Why do we have to reach a constitutional issue anyway? Because the injunction that was entered against the department, Your Honors, bars the department from applying this rule across the board, whether it's Plan B drugs or non-Plan B drugs, whether it's these plaintiffs or other plaintiffs, people who don't have any religious objection. And the only way that the court can authorize this sort of broad injunctive relief against the department that would prevent it from implementing the rule broadly is to say that there's a fundamental constitutional problem here. Otherwise the court is barring the department from acting against people who are not plaintiffs in the case. The constitutional analysis has been figured out now over a great number of years and has come down to two decisions, Smith and Lukumi in the U.S. Supreme Court. The first question the court needs to ask is whether the rule, as the department has promulgated it, is neutral, either facially or effectively. It's my argument that the rule is both facially and, in effect, neutral with regard to religion. It's neutral with regard to religion facially because there's nothing in the text of the rule at all that refers to religious beliefs. I think maybe my opponent would even acknowledge that there's nothing facially that's wrong with this. The dispute is between the effect of the rule. It's also my argument, though, that the rule is neutral as regard to its effect. The lower court made a great deal of emphasis on the exceptions that were in the rule and said that the exceptions show that the effect is to only restrict religious belief. But that's just wrong. The court misunderstood what the rule does. None of the exceptions that are built into the rule allow a non-religious or a religious pharmacy to avoid the obligation of providing that timely alternative for appropriate therapy, which I pointed out in the opening. For example, one of the exceptions built into the rule says that there's no obligation for a pharmacy to dispense a drug to someone who doesn't pay for it. Well, okay, that's fine. But that doesn't change the obligation of the pharmacy when presented with someone with a need for therapy to give them an alternative, to say, you need to come back with enough money and then I can give you this drug, or to say, as one of the plaintiffs did in testifying, that they needed to go to a hospital where they could receive the same type of care for free. That would be a timely alternative for appropriate therapy. If the pharmacy can't meet the duty, the general duty, then that timely alternative for appropriate therapy applies. The same is true with someone who presented a fraudulent prescription, or Plan B, for example, which is not necessarily a prescription drug. If they presented a fraudulent prescription, the pharmacist wouldn't have to accept that fraudulent prescription and dispense the drug, but if the person presented with a need for therapy, the pharmacist would have to say, do you have a need for therapy, the type of drug you're looking for, and then provide them with whatever alternative therapy the pharmacist could provide them with. That rule would be applied whether the person had religious objections or non-religious objections. So even as to its effect, this rule is neutral. The rule is also generally applicable. It applies to all drugs, not just Plan B. It would apply, for example, to drugs, insulin drugs, or any drug that one would require. What's required is the Illinois pharmacy keep on stock the drugs that are federally limited, and if they don't have them on stock, make some provision for their customers to find the alternative therapy, if they have a need for therapy. Now, if the court were to find, as I've argued, that this rule is neutral, then the rational basis applies. Rational basis test applies, and we easily need the rational basis test, because providing... Let me interrupt you, counsel, and ask you this question. Before the trial court, you argued that an injunction should not be granted. Yes. Was there any discussion at the trial court level about the scope of any injunction to be granted? That is, was there any claim that the injunction that was granted was overly broad? Your Honor, I believe there was. I'm not certain, as to where in the record you'd find that. By your department? Up until the very final order that was entered in this case, the trial court very carefully limited the department's injunction to the plaintiffs, and that was all that was asked for throughout the entire litigation. It was only in the very last order that was entered where the court didn't say that the department's rule was invalid as applied to the plaintiffs and held the rule invalid as to all parties. Did the court do that sua sponte, or was that in response to the plaintiffs? As far as I know, there was never an argument asking for the court to bar the plaintiffs, or bar the department from enforcing the rule against all parties, although the complaint certainly did say it was spatially invalid. But the complaint said it was spatially invalid because of the First Amendment argument, and because we lost on the First Amendment argument. It's these plaintiffs who are before us saying that the Act covers them, the Conscience Act provides them with protections, is it not? Yes, it is. Why addressing the question of whether or not that would be appropriate? Now, let me be real clear here. It seems to me that we have two different issues in the injunction. One is, should it apply across the board to restrict the department with regard, for instance, to parties who aren't part of this litigation? Yes. Another question is, does the Conscience Act protect the people who are parties to this litigation? Yes. It seems to me that that is a divisible matter, and while I think, given the ruling of the trial court, you're correct to approach it as you have, saying, well, we have a constitutional matter here, et cetera, we're not so limited. And we could say that the Conscience Act protects these plaintiffs, if we were to so conclude, without addressing or agreeing with the other aspects of the injunction. The reason I'm mentioning all this is because one of the things we are duty-bound to do is to consider, as you mentioned, statutory issues before constitutional ones. The Supreme Court has made that real clear. And I'd want to hear your thoughts about the Conscience Act in particular and why that doesn't provide protections for the particular parties before this court. It does, Your Honor. If the court were to rule against me on the Conscience Act, my argument is only that you should narrow the injunction to say that these plaintiffs are protected by the Conscience Act and they are entitled to a court order protecting them going forward. But more specifically, if I understand you correctly, it's your position that the Conscience Act doesn't protect these plaintiffs? That is my position. That's the argument I'd like you to give us. With regard to the Conscience Act, Your Honor, it's our position that the Conscience Act doesn't apply with regard to this rule because this rule doesn't apply to individuals. It applies only to the practice of pharmacy. And it's our view that the practice of pharmacy is not covered by the Conscience Act. I've set that argument out in our brief. I'd like to focus on my stronger arguments first. If the Conscience Act does apply, my argument is that Section 6 and Section 9 of the Act both provide that if there's an obligation under the law to protect or if there's an emergency situation, there's nothing in the Conscience Act that prohibits or allows a plaintiff to avoid their duty. And so I think that's the section that would apply if the Conscience Act were to apply. In the situation, and this is a narrow situation, where we have someone who comes into the store and asks for Plan B because of an emergent need, someone who comes into the store and asks for Plan B not because of an emergent need, say because she wants to put it in her medicine cabinet just in case. In that situation, what the plaintiff would be allowed to do is to say, the first obligation of a pharmacist, the easy way to do it is to provide them with Plan B. That's the duty. But there's another way of getting around it, this timely alternative for appropriate therapy. And so what could be done in that situation is to say, do you have an emergency? Do you have a situation where you need this drug? If the answer is no, then the timely alternative for appropriate therapy language doesn't require the plaintiff to do anything. They can send that person on the way because there's no therapy needed. The hard case, the case that's got us litigating for years and years and years, is when the person walks into the pharmacy and says, I think I need this drug. And because it's Plan B, because it has an effective life of only three days, that's an emergent need. What can the pharmacy do then with regard to this person? The department needs this pharmacy to do something for her that will allow her to get this drug in a timely way. Now, the people who testified, one of them said, my pharmacy is in an urban environment. You walk down the block, you trip over pharmacies. The person who's asking may not know that, but telling her that may meet the obligation. Timely alternative for appropriate therapy. You need to go to one of the many other pharmacies that are around here and find that drug. And off she can go. The other witness testified that there weren't a lot of pharmacies around, that the nearest pharmacy was a 15-minute drive. That might not be appropriate for a person who's in desperate need of the drug, doesn't have a lot of time left, may not be able to get to that drug. He also said there's a hospital about a quarter mile away that dispenses it. In the situation where a person walked into that pharmacy and said, I am in need of this drug, can you help me with my need? And they say, you know, this is a pharmacy that doesn't stop playing a game. We have religious objections to it. But there's a hospital, it's a quarter of a mile away, and you can get it there. That would meet the timely alternative for appropriate therapy obligation of the rule. They'd be in compliance. And that's my argument, is the Conscience Act doesn't allow people to get around a medical emergency. This is a medical emergency. If they're health care providers under the Conscience Act, which they'd have to be, then this is health care. And sending someone to the hospital to get the health care they need, maybe they don't have the money to buy it. Maybe they don't have the facilities at this particular pharmacy to dispense plan B, which is a fanciful hypothetical since it's prepackaged. But my point is this. All Illinois pharmacies who are faced with a customer in urgent need of a drug can't meet their obligations to that person by simply saying, we're sorry, we can't help you. Because if it's an urgent need for the drug, there has to be something done proactively to help her. This is what Secretary Adams testified to, and this is what I think should control the outcome of this case. Under the Constitution analysis, under the Conscience Act analysis, it's the same. The state has narrowed this rule over the years to the point where it's only the person who presents with an emergent need who has to be helped. And if the pharmacy won't help the person with an emergent need, then I would argue that there's a compelling interest here. This emergent need is a compelling interest. If the court finds itself doing the analysis, say, because of the Illinois RFRA, which I don't think applies. Because of what? The Illinois Religious Freedom Restoration Act would require a strict scrutiny analysis. Also, if the court were to find that this is not neutral, this rule, there would be a strict scrutiny analysis. So if the court were to find itself doing a strict scrutiny analysis, it's my argument that in the narrow situation where the rule applies, we'd need even strict scrutiny. Because you'd have a real live person with a real live need for this drug, with serious health consequences, if the drug isn't somehow dispensed. Not necessarily in this pharmacy, but in a nearby pharmacy. It has to be dispensed somehow, some way. And the pharmacist can't simply say, as a state licensed pharmacist, we're sorry, we just don't do that. It's a narrow... They can say that, but you want them to say more. They have to say something more under the rule, yeah, that's the problem. And it's not that the state doesn't respect that there are religious interests here. There are serious ones. There are First Amendment interests at stake in this case. Can they say there are other pharmacies? Wouldn't that be sufficient? You know, Your Honor, I think we're in the world of fact now. That might be sufficient in Chicago, because the testimony here was that there are dozens of pharmacies within walking distance of the place where the woman would ask for this drug. But we have places in Illinois, downstate, and all over the state actually, not far from where I live, in fact, where you'd be hard pressed to find a pharmacy that was open, say, on a Sunday. When you get into a pharmacy, it's our view, under this rule, which we think the state has a reasonable reason for promulgating, that if a person has a medical need for drugs, and drugs can only be dispensed at state licensed pharmacies, that the person who's in need of that drug should receive some help. And it should not just be some help, it should be some timely help so that they can get the drug. The plaintiffs have religious interests, important ones, at stake in this case. So what do you think the regulation requires the pharmacist to do who doesn't carry Plan B drugs? Well, that's where the language of the Act, or rather the rule, the timely alternative for appropriate therapy, they have to be able to say to this person, we are reasonably sure you can get this drug, this is where you should go. That is what distinguishes this rule, by the way, from the Ninth Circuit rule that was decided in Stormins. Now, in Stormins, it was a must-stock rule, and the court found that objectionable and said, you can't force religious people to have a drug. Is that the rule we started with? We started with it, but Secretary Adams testified that he read this rule to allow for this type of accommodation. This is a religious accommodation. It's also more than a religious accommodation. It will accommodate anyone who doesn't stock this drug. That's part of my argument as to why this is neutral. The Department doesn't care particularly why the drug is not in stock. What the Department cares about is the person who is in critical need of an emergency drug can get it. So, I understand your argument. The pharmacist to whom this, is this a prescription that's being presented? It is only a prescription drug with regard to people who are under 17. With what? Under 17. Okay. So, it's an otherwise non-prescription drug you can, if you're an adult woman, you can simply purchase it. Yes. So, if an adult woman walks into a Morfitt's Pharmacy and says, I'd like to purchase this, your understanding would be to comply with the rule. The pharmacist would say, well, we don't have this, but you may get it in here's where. That would comply with the rule as long as the here's where was reasonable in relation to her need and what's possible. So, they would have to, would the pharmacist have to take it upon themselves to find this out, or does the Department, for instance, furnish a list of this information? So, the pharmacist is a mere conduit of providing this information to the presenting woman who is asking for the drug. The Department isn't pharmacists or isn't a pharmacy. So, that kind of a list would be a hard list to make, especially because this rule doesn't just apply to Plan B, it applies to all drugs. Well, so, then it's the burdens on Morfitt's to find out which pharmacies close by have Plan B drugs available for the presenting woman? Yes, and that's, and the reason why that makes sense is because only Morfitt's knows what its particular restrictions religiously are. Morfitt's Pharmacy knows what drugs it can't dispense in good conscience and what drugs they can dispense in good conscience. Well, I'm not sure I understand the problem. It seems to me, we're talking about a Board of Patients here, Plan B drug, for lack of a better way to put it. Why is this a problem? Why can't the Department provide this information? Why are you putting the burden on Morfitt's to figure out which of its neighboring pharmacies has this? Your Honor, there are religions that don't believe that eating pork is morally appropriate. And there are drugs that are derived from pigs. And there are people who, are religious people, who would say our pharmacy perhaps can't dispense those drugs. The Department is, what is being suggested would be for the Department to figure out all the different religious objections that might exist. Well, how much is this one? No one else has litigated any of that, but this is the subject of some litigation for several years. What's the problem here? It seems to me some intern on a busy afternoon could acquire all this information relatively easily. I don't understand the issue. I think it would be much, much harder than that. The hours of local pharmacies all over the state change all the time. I didn't say hours, it's just which ones have it. Well, the testimony here was that there are 24-hour pharmacies. Walgreens, for example, are open 24 hours a day. I'm not sure that anyone in the state government knows where the Walgreens pharmacies are that are open 24 hours a day. I mean, you could go to their website maybe and find it, but it changes. So the requirement, your position is the pharmacist to whom this request would be made would be in compliance with the rule and no, it would need no protection under the Conscience Act if the pharmacist simply says, we don't have that drug, but you can get it down at the Smedley Pharmacy five blocks away. Under the Conscience Act, the protections are weak because they're not allowed to tell someone who has an emergency that they have conscience protection. So under the Conscience Act, my argument would be they don't have protection under the Conscience Act. They'd have to go to the First Amendment for that protection. Well, but I'm not sure I understand the answer to my question. My question was, would a Morfitts pharmacist be in compliance with the regulation if the pharmacist told the woman requesting Plan B, we don't carry that, but you can get it down at the Smedley Pharmacy five blocks away? I think so. My answer is yes. Okay. You have an opportunity to address this again in rebuttal council. Mr. Renzi? Good morning, Justices. Good morning. May it please the Court. For the past seven years, the state has claimed the power to strip these plaintiffs of their licenses and livelihoods for refusing to violate their religion. And for the past seven years, these plaintiffs and their families and their employees have had to live their lives and work their jobs and run their businesses under that cloud. But last year, based on a well-developed factual record, the Circuit Court correctly determined that such coercion is illegal under state and federal law. And when the state actually had to present a legal, lawful, factual basis for its coercion, not with attorney argument but with actual evidence presented in a courtroom under oath in front of a judge, the state failed to carry its burdens. Well, stopping right there for the moment, I'm curious as to the scope of this injunction. You heard my questions for Mr. Elitz, and his representations were that the injunction up until apparently the very end was sought to protect these plaintiffs, that is, the parties, whereas the injunction actually issued by the Court seems to be rather broader and covering protections for people who aren't litigants here. Is he correct? He's correct in part, Your Honor. So to the extent we're talking about temporary restraining orders and preliminary injunctions, those were specifically designed to protect the people who were at issue of harm. Those have been in effect since April of 2009. The complaint has always sought facial invalidation. And under the Supreme Court's decision in this case, if the plaintiffs were able to prove that the law violates the First Amendment, which we did based on the well-grounded factual findings of the trial court, the proper remedy is to enjoin the law in its entirety. That's what the Supreme Court said in this case. The state makes an issue of this in their brief as if, well, this is suddenly stopping them from enforcing the law against all these other pharmacies that they'd like to enforce it against. That's wrong for a couple of reasons. One, at trial, they admitted that despite the fact that the preliminary injunction only pertained to these plaintiffs, they hadn't bothered to vigorously enforce their law against anybody else. So the claim that suddenly they've been stripped of their ability to use the law against other people is overblown. They never used it against other people. In fact, at trial, the state's witnesses admitted that the only people who they'd ever heard of refusing any drug for any reason were religious objectors to emergency contraception. So it is not as if there's some other class of cases out there to which this law could conceivably apply, right? Well, is there any reason why this injunction needs to be broader than these parties? I think under the First Amendment, there clearly is. The Supreme Court said in this case that if it's proven that the law is facially invalid because it's not neutral and generally applicable, then the right remedy is facially invalid. But this goes to the other question I asked Mr. Elias, and that is we're under an obligation to not reach constitutional questions if we can avoid it. And we have an argument you've made that the Conscience Act protects these people. I think you're still adhering to that argument. Absolutely, Your Honor. Our position is there are three grounds here, and all of them could be sufficient to affirm the judgment. If the Conscience Act is sufficient to affirm the judgment of the court, why does the injunction need to be broader than just these parties? I think the reason it should be broader is that the evidence established at trial, as found by the court, showed that the point of this law was to coerce religious and conscientious objectors in violation of the Health Care Right of Conscience Act. So that, at the very least, an injunction should tell the state, you can't enforce this against religious and conscience-based objectors. I think that's consistent with what the Supreme Court said about the First Amendment claim. Do you believe the state would do that if it were held against only your clients? Do you think that the state would be interested in litigating this in all five appellate districts? I certainly hope not, Your Honor, but I'm in year seven of this. So the state has not walked away easily, despite what I think is fairly clear language from the legislature. But they haven't walked away easily from a single piece of legislation involving identified claims. That's correct, Your Honor. But they haven't sought enforcement against others, so far as we know. Not since 2005, so far as I know, Your Honor. So far as we know. And if you were to prevail, but prevail only on injunctions applicable to your clients, what do you think the state would do? I frankly don't know. I would hope that they would follow the court's opinion and say, we're not going to enforce this against other religious objectors. I don't know that that's true. I would hope that's true. I'm also interested in your assessment of Mr. Elitz's response to the questions asked about compliance with the regulations. You heard my questions for him. He makes it sound like this is minimally intrusive. Assuming he's right in what is required, I take it. Well, let me ask you, to what extent do you find that that would still be a violation of the Conscience Act for your clients? It would, Your Honor. It would be a violation of the Conscience Act. First, let me take a step back. The position of the state at the trial court, if I may, was not what you heard from Mr. Elitz. Mr. Elitz says now referral, if the pharmacist wants to refer, is fine, and that we're only talking about not just emergency contraception, but emergency contraception where someone says there's an emergency. That's much narrower than what they argued at the trial court. At the trial court, here's what they said are the choices that a pharmacist has with an objection. Upon presentation of a valid prescription, if the pharmacy does not have the medication in stock, the pharmacy has four options. Order the drug, which these plaintiffs have a religious objection to doing. Provide a substitute that can achieve a similar clinical effect, to which these plaintiffs have the same objection. Transfer the prescription, transfer the prescription, as in put it in your system and send it someplace and participate. Transfer the prescription to another pharmacy, if the patient so requests. In other words, the right to say, go down the street to Walgreens, is not sitting with the pharmacist and it's his or her choice. It's sitting with the customer who walks in the door. And fourth, or simply return the prescription to the patient, if the patient so requests. This leads to the dilemma that the Supreme Court decided in 2008, when we were up there on the previous versions of the rule, where the court said under the prior law, all that it would take was for a customer to say the words, order it. This is a rule that imposes a duty to deliver drugs. And it puts the ability to refer to some other pharmacy entirely in the customer's hands. So we disagree that the rule can be read to say, oh, pharmacies can just say, oh, go to Walgreens. But even if it did let them say, oh, go to Walgreens, these pharmacists have said they have a religious objection to participating in any way in distributing that drug. Was Mr. Ulett's trial counsel before? He was not, Your Honor. So this argument that we just heard is a new argument from the state? It is, Your Honor. And I'd refer the court to page C828 of the record, which is what I was reading from in terms of the state's view of the prior options. Even at trial. So there would be an objection saying this may be available at another pharmacy? Yes, there would, Your Honor. The plaintiffs have said they object to being involved. And as Justice Steigman's questions were pointing out, the fact of the matter is placing the burden on the pharmacist to go around and figure out what every other pharmacy covers is not fair. They have a religious objection to participating in getting people to use drugs. I knew that the Smedley Pharmacy five blocks away had it, and your position is that that would still be, offend their religious sensibilities. They would object to having to give that referral to this. It would still be the government forcing them to participate in the distribution of this drug. As opposed to simply saying no. As opposed to simply saying, and what the record reflects is that they say very calmly and politely, there's no evidence that these people berate or lecture anybody. Simply saying, I'm sorry, we don't carry that drug. Now, one of the things the evidence at trial showed, which the court found, and which certainly is not against the manifest weight of the evidence, is that the state has lots of other ways to get this information to people. So if the state really thinks there's a compelling interest and an emergency, that people in Morrison, Illinois, need to know that the government at the public hospital three blocks away gives out the same drug, the government can let people know that. If the government thinks people need to know that the ten other pharmacies within a couple of miles of Mr. Kozurov's pharmacy sell the drug, the government can let people know that. They have not acted as if they have any compelling interest here at all, even while they've known that for seven years these pharmacies don't sell it. The record showed that they did nothing to advance that interest. It can't be a compelling enough interest to force these plaintiffs to violate their religion and to violate the Right of Conscience Act, but not compelling enough to get the government to do anything to pursue that interest. Yet the trial court found, based on the testimony of the state, that they had never done anything prior to April 2010 to advance their allegedly compelling interest in dispensing all drugs. In fact, prior to April 2010, here was the state's position in this case. Mr. Kozurov, Mr. Vanderbleek, you can get out of this law entirely if you just agree to get out of the contraceptive business. In other words, for the first five years of this litigation, their claim was that all you have to do is just stop selling regular standard birth control, which neither of these pharmacies objects to. If you just stop selling that, you don't have to sell the emergency stuff. You're totally excused from the law. That was their position at the trial court for five years, among other places at C-538 and 541 in the brief. Well, again, in the record, again, if it's an actual emergency, it's a pretty bizarre position for the state to take. Likewise, if the state is saying it's an emergency that people need to have it, it's pretty bizarre to say we don't require anyone to stock it. And Mr. Elitz talked about pharmacies being closed on Sundays. Well, of course, if a pharmacy has to be closed on Sunday or away for the week, the exact same burdens that the state is talking about could exist in those situations, but the state does nothing to remedy those. The state only seems interested in pursuing this alleged compelling interest in one circumstance, which is against religious objectors. Mr. Elitz made the argument about the emergency language in the Health Care Right of Conscience Act. Several important points about that. First and foremost, it was not raised in the bench trial. It was not raised in front of the trial court. That's why you see Judge Belz's opinion makes no discussion whatsoever of the language that the state is citing on appeal. They didn't make the argument that this is emergency medical care under the Health Care Right of Conscience Act. This wasn't presented below at all? No. So far as I can tell, this is an argument that was made for about a paragraph in their Illinois Supreme Court brief in 2007, but was not presented to the trial court. Certainly not as to this new rule, and I don't think at any point was it presented to the trial court. Certainly not in their closing argument to the bench trial, which you have in the record, which is why Judge Belz never addressed it. But even if it were actually in the case, let me give you several reasons why the law of emergency medical care simply doesn't cover this circumstance. First and foremost, this rule is not part of the law of emergency medical care. This rule applies to every single drug in every single circumstance every single day. This is not a law that is triggered by emergencies. Whether it's an emergency or not, this rule by its terms applies. So it's not part of the law of emergency medical care. The state admits it doesn't require doctors to write prescriptions for the drug. And just a slight clarification, some of the drugs are available without a prescription, but some are not. So for example, Ella, which works for five days after pregnancy, and is sometimes called the week after pill as opposed to the morning after pill, Ella is available only by prescription. But the state admitted they don't require doctors to write the prescriptions. It's tough to figure out how it could be emergency medical care at the pharmacy counter but not in the doctor's office, if the state admitted that they don't require that. And again, at trial, the evidence was clear that there was no medical emergency at all. Dr. Wallace, the state's medical expert, admitted that in 35 years of practice, he had never heard of a single actual situation where someone was unable to get their drug. He'd never heard of it with emergency contraception actually happening. Never heard of it with any other drug. That's presumably why Dr. Wallace said there would be no real serious medical problems with giving these plaintiffs an exemption, because there are lots of pharmacies around. And the state's argument that, well, if you refer to the Walgreens, that's good enough. Well, if somebody... Sorry, I lost my train of thought for a second. The state says, well, if you refer to the Walgreens, that's good enough. Well, that assumes that the person's able to drive to the next Walgreens too. In other words, the state's argument doesn't solve their claimed problem of the human being who's only able to get to one pharmacy. But the facts at trial showed that the state didn't carry its burden to show that any such situation existed. The state's expert admitted there's no serious medical harm from allowing these plaintiffs an exemption. Secretary Adams admitted there was no serious medical harm from allowing these plaintiffs an exemption. That's the facts that were before the trial court. And that's why the trial court found there really just is no emergency here. There is no problem. There are lots of willing people who sell it. And also that the state has lots of ways to get it to people. Another thing that the record showed, which the trial court relied on, is that for many years the state established websites to catch the religious objectors, phone hotlines with specially trained operators to catch the religious objectors, sign requirements to post in every pharmacy in the state telling you how you can catch the religious objectors. But the state never used any of that apparatus to direct people to willing sellers of the drug. Again, the state knows how to do these things. They regulate every pharmacy in the state. The claim that they can't figure out who sells emergency contraception is not a very good claim. They regulate every single pharmacy in the state. They could find it out if they wanted to find it out. They could find it out if it was actually an emergency. But they never used their websites to just direct people to willing sellers. They never used their phone numbers to let people know where to get it. They never post signs anyplace to let people know where to get it. It's as if the desperate urge to make sure people know where to get it only happens in one place, which is the plaintiff's pharmacies. That's not right. That's not an emergency. The state has also not acted in this appeal as if it thinks there's a compelling interest or an emergency. This law was first subject to a temporary restraining order in April of 2009. We're now here for the first time three and a half years later. If the state actually thought there was a serious medical emergency going on, you would have seen an expedited appeal. You would not have seen three and a half years before we actually get to the court. They're not acting as if it's an emergency at all. They admitted that they didn't vigorously enforce their prior requirements. And again, ultimately, if the state's concern is we need to have a rule that we can enforce against big chain pharmacies that don't have religious objections, they can solve that problem this afternoon. They can issue a rule that says you have to do X, Y, and Z unless you have a religious objection. That would solve the problem. And the Supreme Court told them that in 2008. But since 2008, they haven't changed the rule. They haven't been willing to give the religious exemption that the Health Care Right of Conscience Act requires. The Health Care Right of Conscience Act is obviously a very, very broad statute. It says on its face that it's the policy of the state to respect and protect the right of all persons engaged in the delivery, arrangement, or payment of health care services and medical care. Obviously, delivery of medications is part of health care. In fact, in many ways, that's the core argument of the state. That's the core position of the state. That, of course, this is health care and it's important. Their experts admitted it. Their witnesses at trial admitted it. It clearly covers pharmacies and it's not part of the emergency care exception. But even if the Health Care Right of Conscience Act did not exist, the plaintiffs win this case on two other grounds, which are the Religious Freedom Restoration Act and the First Amendment. Under the Religious Freedom Restoration Act, the government needs to establish, the statute says they have the burden of going forward with evidence and persuasion. They need to establish that they have a compelling government interest in forcing the particular people at issue to violate their religion. They failed to carry that burden. The evidence at trial said that this actually wasn't a real emergency and that there actually was no medical harm to excusing these plaintiffs. And that makes perfect sense. There are lots of willing sellers of the drug. The Health Care Right of Conscience Act essentially embodies the state's position that we're not going to have a rule that says to deliver health care, you need to be willing to do every last thing that anyone ever considers health care. Instead, we're going to say that we'll take as much as everybody can give us. And here, the facts at the trial court showed, and the admissions of the state's expert witness and of the secretary showed, that there's no medical harm. So there's no compelling interest here and it's not the least prescriptive means. Last point I'd like to mention on the free exercise clause. The state argues this rule is neutral. The state doesn't mention the trial judge's fact findings that the point of the rule was to target religious objectors. Those fact findings were well-founded. Stretching all the way back to 2005 and going all the way forward to 2010, the state demonstrated in its evidence that the goal of this law was, in fact, to stop the religious objectors. They were the only people who were objecting in the first place. Secretary Adams admitted that he only got the idea for the broader rule by reading a Plan B case. He consulted with Planned Parenthood about how to expand his rule. The broader rule was in a file labeled Plan B, on a pad labeled Plan B, with his notes that said patient need rather than pharmacist morals should determine who gets the drug. Everything about it showed it was targeted. The trial court had ample grounds to make those factual findings. And in truth, if you look at the state's pre-fine appeal, the state does not actually go all the way to claim that the judge's finding was against the manifest weight of the evidence. They mention that standard early, but then they never get around to claiming that it was against the manifest weight of the evidence, and they can't because the evidence was so clear. On the issue of general applicability, again, the duty to dispense has lots of exceptions in it, including if somebody's a couple bucks short of the price. But the easiest part for general applicability is the variance provision, because the state admitted at trial that its variance provision allows for individualized government assessments of the reason somebody wants a variance. And Secretary Adams admitted on the stand that he could envision granting a variance for a whole variety of reasons, but that he could not at the time envision granting one for a religious objection. Now, that's at a trial at which his own expert witness had just said that, as to Mr. Casarog's pharmacy in Chicago, for example, there was no significant medical harm by him having an exemption. But even in the face of that, Secretary Adams said, I can't envision granting one for religious reasons. Under the Church of the Lukumi case, that's dispositive. That says that this is not a law of general applicability, because the state is willing to grant variances for other reasons, but not for religion. That was the testimony of Mr. Casarog. Can you question him as to why not? As to why he couldn't envision one at that point? Yes. No. He simply said he could not envision one. That's what he had said in his deposition. Give me an example of another variance. I'm not aware of that. That he said he would permit. He said he could envision them for a whole variety of circumstances, but he couldn't envision them for religious reasons. What are the varieties? I don't know, Your Honor. I don't know. I know that the testimony from the man who grants the variances is a whole variety of other reasons I can see, and I can't see religion. Were you trial counsel? Yes, I was, Your Honor. You didn't choose to ask him any questions to clarify any of this? Like, what are the other reasons, and why won't you grant him for this? No, Your Honor. And, again, under Lukumi, I don't think that was my obligation, to be honest. Well, it's not a question of obligation. It would be a matter, frankly, I'd be interested in, and it would help to flesh out exactly how this case appears before us. I agree with you, Your Honor. And as I stand here right now, do I wish I asked those questions? I do. Ultimately, I would say, as the Supreme Court found in the 2008 case, it would have been futile for religious objectors to ask for an exemption, and the trial court is right to find that. Thank you very much. Thank you, counsel. Mr. Edlitz, any rebuttal, sir? Yes, sir. I have a lot of rebuttal, actually. Okay. I think Secretary Adams' testimony has just been mischaracterized, Your Honor. What Secretary Adams said was, not at this time, but I would have to consider the totality of the circumstances as it was contained in the application for a variance. That's what he said. So what he said was, he would consider a religious request for a variance, but he had to see one. When he was asked if he could imagine what one might be that would be successful, he said he didn't have any idea. No, he apparently could imagine variances for lots of other reasons. He could imagine them, but he didn't see how one could be made with regard to a religious exception. And the reason is because, which is another thing that he testified to, which I don't think was fairly represented, because the rule provides for a timely alternative to appropriate therapy. What the rule says in Subpart G is not just Subpart 1, 2, and 3, which were just read to you, but it says that if the lawfully prescribed drug, et cetera, et cetera, is not in stock or otherwise available, or the prescription cannot be filled pursuant to the other provisions, the pharmacy shall provide the patient or agent a timely alternative for appropriate therapy. Secretary Adams' testimony emphasized this language and said this language would cover religious objectors up to the point where we couldn't go any further, which is the person who presents with a true emergency and has to have something that will get them the drug. And he did say that sending them to a nearby place where the drug was in stock might meet the requirements of the rule. This was a declaratory judgment action, so we don't really have the facts as they actually occur. We have to sort of think about what the possibilities would be. The department has taken the position that we can try to meet the religious obligations of these plaintiffs, but we can't meet those obligations when faced with a person in medical need for a drug whose effectiveness will expire if she doesn't receive it soon. What about the position of Mr. Enzi that the argument you made to us was the first time the state has made this argument about all that the pharmacists need do? I don't believe that's true, Your Honor. I come at this case as an appellate lawyer, so anything that I know about this case comes from your record. It comes from the Supreme Court's decision. It didn't pop into my head. Well, you heard his representation of the four things that the state said you have to do if you're a pharmacist. So someplace in this record, we will find the argument that you made to us as saying this is all you've got to do? And that place will be Secretary Adams' testimony where he talks about this rule. He talks about the places that Mr. Enzi described to you as to how the rule could be complied with, but he also talked about the timely alternative for appropriate therapy language and said this would be another way for the plaintiffs to comply with it. I thought Mr. Enzi made the argument that the emergency nature of this treatment, that argument was not made in the trial court. That argument was not emphasized in the trial court, Your Honor, because our position was and is that the Conscience Act does not apply by its terms to pharmacists or pharmacies. If it does apply, then obviously the court needs to look at what sections apply. But the sections that he says apply also have the Section 6 and Section 9 that have this emergency language. It was an argument that was certainly made, and I recall it was made, in the Illinois Supreme Court. It wasn't a new argument in this case. How about before Judge Bills? Your Honors, I just don't remember. Well, the problem, Counsel, is you're asking us to reverse the trial court, perhaps in an argument the court never heard, which is really a difficult posture. I'm not conceding the court never heard it, Your Honor. I just don't remember whether the court heard it. Well, to say that it was made before the Illinois Supreme Court doesn't count much as far as Judge Bills and the arguments he heard. Yes. Would you comment on, was Mr. Enzi correct that the way that this rule would work for the present state of the law is that a physician would not have to write this prescription, but that if the prescription is written, then you want the pharmacy to fill it? I believe the question was asked of Secretary Adams as to whether the Department had a rule requiring doctors to prescribe any particular medication that the plaintiff is subject to, and the answer was there is no such rule. The federal department doesn't have such a rule. So that is true that doctors do not have an obligation, apparently, based on, totally from my understanding, from Secretary Adams' testimony, that doctors don't have an obligation to write this prescription. I don't know what a physician's obligations are to refer a patient to someone who might do that, though. I mean, it seems to me that lawyers have an obligation with a client who wants a defense made that the lawyer has an obligation to make. He says, I can't, I can't, you know, religiously I can't conscientiously make that argument, but it's an argument that you might find another lawyer would be willing to make and to say, you're going to have to find a different lawyer, but it won't be me. You know, maybe that's the way it works for doctors. And in fact, that's almost what we're saying here with regard to the pharmacy rule. If someone shows up in a pharmacy and says, I need, because of an emergency, this drug, the Department is saying, they can send that person to a different place, and that will comply with the rule. Your time is up. I'm going to give you another minute if you needed to, if there was some other aspect you wanted to mention to us in rebuttal. Thank you, Your Honor. There is one other aspect, which is the discussion about the broadness of the injunction. With regard to Justice Connick's questions about what the state would do if the decision came down and made it clear that these plaintiffs have rights under the Conscience Act, they would be protected by stare decisis. Some future plaintiffs would have the ability to say, look, this case was decided by the court, it was an appellate tribunal, it binds people under the law, and we have to comply with that for stare decisis reasons. But we should not be bound by an injunction for unnamed people in some unnamed case in the future. The question of whether this case would apply to those plaintiffs ought to be decided then and not now. Thank you, counsel. We'll take this meeting under advisement of being recessed until this afternoon.